Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| NILO D. TUAZON<br><br>   Plaintiff(s),<br><br> vs.<br><br>R.J. REYNOLDS TOBACCO CO., a foreign corporation<br><br>   Defendant(s). | No.: CV 03-0929 P<br><br>SECOND AMENDED COMPLAINT |

PLAINTIFF NILO D. TUAZON amends his Amended Complaint herein, pursuant to the Court's Order dated June 13, 2006, and alleges as follows:

**JURISDICTION AND VENUE**

1. Plaintiff Nilo D. Tuazon is a citizen of the State of Washington, residing in Renton, King County, Washington.

2. Defendant R.J. Reynolds Tobacco Co. [hereinafter referred to as "RJR Tobacco"] is a foreign corporation with its principal place of business at 401 Main Street, Winston-Salem, North Carolina 27102-2866. Throughout the relevant time, it sold cigarettes under various brand names including "Salem" in the United States.

SECOND AMENDED COMPLAINT   1   355 Ericksen Avenue Northeast, Suite 421
(No. CV 03-0929 P)   Post Office Box 11440
   Bainbridge Island, Washington 98110

3. Plaintiff seeks an amount in excess of Seventy-five Thousand Dollars ($75,000.00) in damages.

4. This Court has jurisdiction of this matter pursuant to the provisions of 28 USC § 1332(a) [Diversity of Citizenship].

## APPLICATION OF FOREIGN LAW

5. During most of the time relevant to plaintiff's Complaint, he resided in the Republic of the Philippines ["Philippines"].

6. Some of the conduct of the defendant, described below, took place in the United States and in other countries, and other conduct and the resulting harm to plaintiff took place in the Philippines.

7. Plaintiff alleges pursuant to Federal Rule of Civil Procedure 44.1 that the laws of the Republic of the Philippines apply to this matter.

## AFFILIATES, SUBSIDIARIES AND LICENSEES

8. Defendant RJR Tobacco is owned by R.J. Reynolds Tobacco Holdings, Inc., which is a successor to RJR Nabisco Holdings, Inc. During most of the relevant time herein, R.J. Reynolds International, Inc. was similarly owned, and as an affiliate of defendant RJR Tobacco sold "Salem" brand cigarettes in other countries. It licensed its brand to Fortune Tobacco International, Ltd. for the sale of "Salem" cigarettes in the Republic of the Philippines.

9. In 1999, R.J. Reynolds International, Inc. was sold to Japan Tobacco, Inc., and use of the "Salem" trademark in countries other than the United States, including the Philippines was transferred to it together with the business and other international trademarks of R.J. Reynolds International, Inc. R.J. Reynolds International was renamed Japan Tobacco International, Inc. and is a wholly-owned subsidiary of Japan Tobacco, Inc. Various subsidiaries

of Japan Tobacco International, Inc. exist in different countries, including JT International (Philippines), Inc.

## CONSPIRACY

10. Since December, 1953, and continuing to the present time, defendant RJR Tobacco has combined and conspired with various other tobacco companies in the United States and in other countries in a manner more fully described below. Its co-conspirators in the United States and abroad include Philip Morris, Inc., British American Tobacco Co., Ltd. and its U.S. subsidiary, Brown & Williamson Tobacco Co. Co-conspirators abroad include Reemtsma Cigarettenfabriken GmbH, Imperial Tobacco Ltd., Rothmans International, Inc. and Japan Tobacco, Inc. Various subsidiaries and affiliates of each were and are also co-conspirators of defendant RJR Tobacco. Within the United States, other co-conspirators include the former American Tobacco Co., Inc., and for at least substantial periods of the conspiracy, Lorillard Tobacco Co., Inc. and Liggett & Myers, Inc.

11. Following meetings in New York in December, 1953 and early 1954, executives of defendant RJR Tobacco agreed with their counterparts from American Tobacco, Brown & Williamson, Lorillard, Philip Morris and others to create the "Tobacco Industry Research Committee" [TIRC]. The purpose of the organization was to ensure that the U.S. cigarette manufacturers coordinate their advertising, public statements, marketing behavior and research activities to avoid any concession that might cause decreases in sales of cigarettes or be used against them in litigation in the future. In particular, the conspirators agreed that none would do anything to suggest that cigarette smoking causes any disease and none would do anything to suggest that nicotine is addictive. Additional agreements became part of the conspiracy over

time and the Tobacco Institute and Council for Tobacco Research succeeded TIRC, but the essential purpose of the conspiracy remained unchanged.

12. In December, 1977, the U.S. conspiracy was formally extended internationally. In that month, executives of defendant RJR Tobacco met secretly in the United Kingdom with counterparts from British American, Imperial, Philip Morris, Reemtsma and Rothmans. The executives agreed to create the "International Committee on Smoking Issues" [ICOSI]. The objectives of ICOSI and the international conspiracy were identical to those of TIRC and the U.S. conspiracy. Defendant RJR Tobacco was chosen to lead the organization's "Working Party on Social Acceptability of Smoking." The conspirators agreed to coordinate their behavior to avoid any concession that might cause decreases in sales of cigarettes or be used against them in litigation in the future. Additional agreements became part of the conspiracy over time and "Infotab" succeeded ICOSI, but the essential purpose of the conspiracy remained unchanged.

13. Among other means used to ensure that all cigarette companies adhered to a uniform standard of behavior, defendant RJR Tobacco and the other international conspirators agreed that each would require their respective affiliates, subsidiaries and licensees to conform to the same standard. In addition, they agreed to create "National Marketing Associations" [NMA] in every country in which any of them did business to ensure that the Industry spoke with a single voice throughout the world. Among the NMA created is the "Philippine Tobacco Institute," which furthers the activities of the conspiracy by coordinating Industry public statements and other activity in the Philippines.

14. Defendant RJR Tobacco and the other international conspirators also agreed to create regional marketing associations, to coordinate Industry public statements and other activity in various parts of the world. Among the regional marketing associations it formed is

the "Asian Tobacco Council," created in 1990. The Asian Tobacco Council furthers the activities of the conspiracy by coordinating Industry public statements and other activity in Asian countries, including the Philippines.

15. As a result of the Industry's conspiratorial agreements, defendant RJR Tobacco and the other co-conspirators completely control their respective affiliates, subsidiaries and licensees with regard to advertising policies, public statements, and responses to government initiatives, such as warning labels, in every country in the world in which one or more of them does business, including in the Philippines.

16. Among other results of the Industry's conspiratorial agreements, the following took place in the Philippines:

    a. Packages of cigarettes sold in the Philippines were not required to carry any health warning labels until 1993. Even then, implementation of the Philippine law was delayed by litigation initiated by the co-conspirators.

    b. In public statements in the Philippines, the various instrumentalities of defendant RJR Tobacco and its co-conspirators, including their respective affiliates, subsidiaries and licensees and other instrumentalities, including Infotab, the Asian Tobacco Council and the Philippine Tobacco Institute denied that cigarette smoking causes any disease.

    c. In public statements in the Philippines, the various instrumentalities of defendant RJR Tobacco and its co-conspirators, including their respective affiliates, subsidiaries and licensees and other instrumentalities, including Infotab, the Asian Tobacco Council and the Philippine Tobacco Institute denied that nicotine is an addictive drug.

17. Defendant RJR Tobacco has known, or should have known since the 1950s that cigarette smoking causes disease.

SECOND AMENDED COMPLAINT    5    355 Ericksen Avenue Northeast, Suite 421
(No. CV 03-0929 P)    Post Office Box 11440
Bainbridge Island, Washington 98110

18. Defendant RJR Tobacco has known, or should have known, since the 1960s at the latest that nicotine is an addictive drug.

**CLAIM FOR RELIEF
NEGLIGENCE AND
GROSS NEGLIGENCE**

19. Plaintiff began smoking "Salem" brand cigarettes in 1958 and is addicted to nicotine.

20. Plaintiff has Chronic Obstructive Pulmonary Disease ["COPD"] and coronary artery disease as a result of smoking "Salem" cigarettes.

21. Defendant RJR Tobacco supplies and controls design standards and various ingredients and additives used by its licensee Fortune Tobacco to manufacture "Salem" cigarettes in the Philippines.

22. Defendant RJR Tobacco owed a duty to plaintiff to reveal all material facts concerning its products, including whether they caused disease and whether they contain an addictive drug.

23. Defendant RJR Tobacco owed a duty to plaintiff to design, manufacture and market cigarettes that do not pose an unreasonable risk of disease and addiction.

24. Defendant RJR Tobacco designed, manufactured and sold "Salem" cigarettes, which it knew or should have known pose an unreasonable risk of disease to those who smoke them.

25. RJR Tobacco did not adequately test "Salem" cigarettes or their constituents in order to permit it or its licensees to properly warn users or to manufacture cigarettes that reduced the risks to users.

26. Defendant RJR Tobacco failed to adequately warn plaintiff of the risks of diseases associated with smoking "Salem" cigarettes, including the risk of developing COPD or coronary artery disease, and of the potential for addiction to nicotine.

27. Defendant RJR Tobacco and its licensee failed to manufacture and market products that reduce the risks to users, despite their abilities to do so.

28. Defendant RJR Tobacco and its licensee use various methods to enhance and otherwise increase the bioavailability and/or the addictiveness of the nicotine contained in "Salem" cigarettes.

29. Defendant RJR Tobacco breached each duty described herein that it owed to plaintiff.

30. Through its participation in the conspiracy described above, defendant RJR Tobacco caused each of its affiliates, subsidiaries and licensees to conform to the conspiracy, thus breaching its duties to plaintiff.

31. The acts and omissions of defendant RJR Tobacco constitute negligence and gross negligence.

32. Plaintiff was proximately injured as a result of the negligence and gross negligence of defendant RJR Tobacco, and damaged thereby.

33. Defendant RJR Tobacco is liable to plaintiff for its negligence and gross negligence pursuant to the provisions of the Civil Code of the Philippines [hereinafter referred to as "Civil Code"], Title XVII, Chapter 2, Article 2176, which provides in relevant part, "Whoever by act or omission causes damage to another, there being fault or negligence, is obliged to pay for the damage done."

## DAMAGES

34. Defendant RJR Tobacco is liable for all damages caused by its negligence and gross negligence, pursuant to the Civil Code, Title XVIII, Chapter 2, Article 2002, which provides in relevant part, "In crimes and quasi-delicts, the defendant shall be liable for all damages which are the natural and probable consequences of the act or omission complained of."

35. Plaintiff's damages consist of actual damages, including, but not limited to damages "For loss or impairment of earning capacity in cases of temporary or permanent personal injury." Civil Code, Title XVIII, Chapter 2, Article 2205.

36. Plaintiff's damages also include moral damages. "Moral damages include physical suffering, mental anguish, fright, serious anxiety, besmirched reputation, wounded feelings, moral shock, social humiliation, and similar injury. Though incapable of pecuniary computation, moral damages may be recovered if they are the proximate result of the defendant's wrongful act or omission." Civil Code, Title XVIII, Chapter 3, Section 1, Article 2217.

37. Plaintiff is entitled to exemplary damages, which may be granted where the defendant acted with gross negligence. Civil Code, Title XVIII, Chapter 3, Section 5, Articles 2229-2234.

38. Plaintiff is entitled to his attorneys' fees and expenses of litigation in the event exemplary damages are awarded, or if the Court deems it just and equitable that the same should be recovered. Civil Code, Title XVIII, Chapter 2, Article 2208.

WHEREFORE, plaintiff prays for relief against defendants RJR Tobacco as follows;

1. For determination that the law of the Republic of the Philippines applies to this action;

2. For judgment for plaintiff's actual and moral damages in such amounts as shall be proven at trial;

3. For judgment for exemplary damages in such amount as determined at trial;

4. For award of plaintiff's attorneys' fees and expenses; and

5. For such other and further relief as the Court deems just and proper.

Dated June 29, 2006.

**JON FERGUSON LAW GROUP, PLLC**

By: /s/_____
Jon P. Ferguson, WSBA No. 5619
355 Ericksen Avenue NE, No. 421
P.O. Box 11440
Bainbridge Island, WA 98110
Tel.: (206) 855-0838
Fax: (206) 855-0840
e-mail: jon@jonfergusonlaw.com

Attorney for Plaintiff Nilo D. Tuazon

# CERTIFICATE OF SERVICE

he undersigned attorney certifies that on June 29, 2006, he caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system and understands that system will send notification and a copy of the filing to each of the individuals listed below:

Bradley S. Keller
William H. Walsh
Byrnes & Keller LLP
1000 Second Avenue, 38th Floor
Seattle, WA 98104
206-622-2000

/s/
Jon P. Ferguson